UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| MARY R. RICHARDS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 15-CV-00646-JPG-SCW |
| | ) | |
| U. S. STEEL, | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff, MARY R. RICHARDS, by her attorney, Greg Roosevelt, for her Response to Defendant's Motion for Summary Judgment states as follows:

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Lawson v. CSX Transp., Inc.*, 245 F. 3d 916, 922 (7th Cir. 2001). In determining whether a genuine issue of material fact exists, this Court must construe all facts in the light most favorable to the non-moving party as well to draw all reasonable and justifiable inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2502, 91 L. Ed. 2d 202 (1986); *King v. Preferred Technical Group*, 166 F. 3d 887, 890 (7th Cir. 1999). To overcome a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in its pleadings. Rather, the non-moving party must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial. *Celotex v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 . Ed. 2d 265 (1986); *Robin v. Espo Eng'g Corp.*, 200 F. 3d 1081, 1088 (7th Cir. 2000).

## STATEMENT OF FACTS

### Mary Richards

Richards asserts claims of Sexual Harassment, Retaliation and Intentional Infliction of Emotional Distress is her complaint against U.S. Steel. TR P14 L16-23.

Jesse Byrd, her supervisor, would not give Richards needed tools. TR P15 L7-12. Other learners got their tools. TR P15 L13-15. This began in April, 2010 when she started for him. TR P15 L16-23. Richards worked for Byrd in the BOF. TR P16 l1-3.

Richards made a complaint to H.R. Lydia Kachigian about not getting the tools. TR P18 L16-18. This was done in a civil rights complaint by the Union to Kachigian. TR P19 L5-7. Richards complained to Byrd several times. TR P21 L12-14.

Richards would ask Byrd for needed tools and he would deny he had any to give her. TR P26 L13-17. Richards transferred out of the BOF at her request in January, 2011. TR P28 L13-15. In April, 2010 Richards went to BOF as a learner under Byrd's supervision. TR P36 L20-25, TR P37 L1-15. Byrd singled Richards out to ask her what she learned in blueprint class. TR P37 L1-10. Byrd had not asked this of other learners. TR P38 L1-10.

In June, 2010 Richards was on break in a patio area when Byrd approached her and jerked her jacket open and said, "I like that." TR P38 L21-25 and TR P39 L1-9. Richards was shocked, scared and just got away from him. TR P39 L1-9. Richards knew he was looking at and commenting on her chest. TR P39 L10-14. Richards immediately reported this to her union. TR P39 L15-21. Richards reported it later on the company hotline after H.R., Lydia Kachigian told her she would have to adjust to her environment. TR P40 L1-15. Richards reported the incident to her union with the expectation that they would act. TR P42 L1-9. There was also an incident where Richards was standing on a bucket to get screws to fix fluorescent light and Byrd

said "You think that bucket will hold all of that." TR P43 L9-21. Two other electricians were in the room. TR P43 L11-17. Richards reported this to the union and H.R. knew about it. TR P45 L5-10. In another incident Richards had lost a glove and approached Byrd who was talking to 4 men asking for gloves. TR P45 L22-25, TR P46 L1-3. Byrd made it a point to ask her if she wanted one glove or two and made a remark about incompetent people. TR P46 L1-8.

Richards came to work and a coworker warned her that Byrd was going to jump her. TR P48 L21-25, TR P49 L1-2. Byrd waited until all of the workers were present and then jumped her for not putting the box on a shelf. TR P49 L1-13. Richards reported this to the union and they sent her to EEOC. TR P50 L1-6. Richards later saw the harassment hotline number in a weekly update. TR P52 L7-9. The number was not in the sexual harassment policy she received and the hotline was new. TR P52 L7-13. Richards called the hotline in February, 2011 when Lydia Kachigian of H.R. told her, "Just because you don't like Jesse's rough management style doesn't mean we have to do anything, and you need to adjust to your environment." TR P53 L17-22. Richards took her complaints, including the jacket incident to her union who she expected to speak to management. TR P55 L5-10. Richards did report the jacket incident on the Hotline. TR P56 L11-13.

In February 2011 Richards called the Hotline after getting no results from Lydia Kachigian or the union. TR P60 L1-17. Richards states Byrd threatened her with discharge after she called him for assistance after a major breakdown occurred on the job. TR P66 L21-25 and TR P67 L1-12.

On a New Year's Eve Byrd makes Richards call another worker to request him to do overtime. TR P68 L24-25 and TR P69 L1-21. The coworker asked Richards if she would do the overtime and Byrd ordered Richards to get off the phone stating he would jump off a bridge

before he allowed her to work overtime. TR P69 L10-21. Another incident occurred in the break room when Byrd approached Richards and asked if she was listening to him and asking "What, are you scared of me?" TR P82 L4-15. Richards states she was too scared to even answer. TR P82 L23-25. Richards states she told Byrd to quit doing this to me. TR P83 L1-2. Jeff Evans, her union rep., took her issues to management. TR P83 L14-23. Evans filed the civil right complaints with Lydia Kachigian and sent Richards to EEOC. TR P85 L17-25.

Richards worked through an event where a fellow electrician suffered heat exhaustion. Richards got the worker to the break room and started aid. TR P87 L1-25. Richards called for Byrd and when he did arrive he started screaming at her. TR P88 L6-20. Richards was ordered to sit in the break room and Byrd approached her telling her to tell her boss he was a prick. TR P89 L5-12. Richards said nothing. TR P89 L11-12. Byrd then moved behind her and stated, "Matter of fact, tell your boss he's a prick." Byrd was her boss. TR P89 L13-17. Richards stated he was angry and was pacing back and forth. TR P89 L13-20.

Richards left the room when Byrd told the story about his wife wanting him to put Miracle Gro on his weezer. TR P92 L12-25. Richards informed the union of the incident. TR P98 L1-3. Following the incident when Richards worked overtime, Byrd placed Richards on trash detail in retaliation. TR P105 L5-10. Immediately following Richards making the hotline report, she was ordered to go to see Mark Tade of Human Resources. TR P117 L12-20. Tade asked Richards about the jacket incident and Richards become upset and started to cry. TR P121 L11-18. The outcome of the meeting was that Tade told Richards she was too emotional and needed to see a psychiatrist. TR P121 L17-23. On another instance Richards was seated in a chair in the break room when Byrd approached her stating repeatedly that she was sitting in a

bad luck chair. TR P127 L1-8. When Byrd left the coworkers stated that was the chair a former coworker, Mark Lotts, was sitting in when Byrd fired him. TR P127 L8-10.

Richards states that U.S. Steel failed to provide her a bathroom which was clean and was a woman's bathroom. TR P133 L1-25 and TR P134 L1-4. When they did give her a woman's bathroom they then made it unisex. TR P134 L9-14. When Richards spoke to Lowery McBride he offered her a porta pot and Richards stated that she still would have no place to wash her hands. TR P140 L11-25.

In two instances since she left BOF Byrd has followed her after they both clocked out, standing beside her at the stoplight attempting to speak to her which upset Richards and she walked away. TR P157 L1-25. TR P159 L19-22.

Richards felt victimized in that she called the Hotline and Human Resource's response was to call her too emotional and that she needed a psychiatrist. TR P164 L16-23. Richards points out that she complained of the harassment in two civil rights meetings. TR P165 L7-13.

Jesse Byrd's conduct in telling the Miracle Gro joke was demeaning and just as unsatisfactory as any grabbing or touching of a sexual nature. TR P181 L12-20. Richards was asked if other women in BOF had been harassed and she stated that Tonya saw Jesse Byrd rubbing on an Oreo cookie on his private parts. TR P182 L13-19.

Lowery McBride once blocked a door Richards was trying to exit and grabbed a radio pulling it off her chest making her uncomfortable in that it was hooked to her bra. TR P207 L1-11. This was intimidating TR P127 L14-18.

Kachigian told Richards she just had to adjust to Byrd's rough management style. TR P208 L21-25. Kachigian did not discuss the EEOC report with Richards TR P209 L7-11. Richards believes H.R. should have spoken to her and investigated her concerns. TR P212 L10-

22. Richards did complain by filing the two civil rights complaints and through her union reps. TR P220 L11-16. Mark Tade retaliated against her for complaining by not dealing with the issues and summarily calling her too emotional and in need of a psychiatrist. TR P223 L7-12. Richards believes the company wants to eliminate anyone who steps up. TR P246 L7-11.

Richards was terminated for failure to call in for a missed shift. TR P249 L1-12. Dan Bunker was not terminated even though he called off just before his shift. TR P249 L13-15. Her supervisor, Ed Dintelman knew Richards had an EEOC complaint. TR P251 L23-25, TR P252 L1-6. Richards believes this discharge by Dintelman was retaliatory. TR P251 L6-11.

Kachigian's statement that Richards had to adjust to Byrd's rough management style was the intentional infliction of emotional distress. TR P271 L6-13. Tade's statement that Richards was simply too emotional and needed to see a psychiatrist was the intentional infliction of emotional distress. TR P272 L1-4. Lowery McBride ripping her radio off her chest when he had one in his back pocket was the intentional infliction of emotional distress. TR P272 L7-13.

Richards counseled with Psychiatric Services of Southern Illinois. TR P273 L13-22 and complained about the conditions at U.S. Steel. TR P274 L25, TR P275 L1-2.

## Jesse Byrd

Byrd works in the BOF. TR P6 L3-4. Byrd supervises the electricians in maintaining equipment. TR P7 L4-6. Byrd supervises Richards assigning her to work projects and monitoring her work TR P11 L18-24. Byrd claims Richards lacked some of the basic understanding of electrical. TR P12 L22-24. Byrd claims the working relationship with Richards was "combative" and "she liked to fight and argue about everything." TR P14 L1-9.

When asked if Byrd ever made a statement in front of Richards and other employees that he dislikes people who are incompetent he stated, "I don't know. I couldn't tell you yes or no. I don't know. It's hard to say." TR P18 L25, TR P19 L1-3.

Byrd states that it is not uncommon for him to give a vacation day to an employee if they missed work rather than given them an absence. TR P22L19-25. Byrd saw a copy of the OSHA letter on harassment in the BOF Electrical Shop. Exhibit 1. TR P26 L1-3. Byrd denies the OSHA findings that employees were subject to disciplinary harassment and verbal abuse from management in the BOF Electric Shop. TR P26 L10-14.

Byrd does not recall his supervisor Mr. Lowery or anyone from U.S. Steel management speaking to him about the OSHA recommendations made in the letter. TR P26 L20-25. Byrd does not know if any of the recommendations were followed. TR P27 L21-25, TR P28 L14-15.

Byrd was asked, "Do you recall an instance where you approached Mary in the break room and said to her, "say your boss is a prick" and he gave this answer, "I don't know. I don't remember it ever happening, but who knows." TR P29 L18-23.

Byrd recalled an instance where Richards was standing on a bucket to reach some screws and Byrd asked her if the bucket was load rated. TR P29 L24-25 and TR P30 L1-6. Byrd admits stating to his employees, with Richards present, that his wife was planting flowers and Byrd asked her if she was sitting in the Miracle Gro and her reply was "Maybe we should put some on your weezer." TR P31 L7-15.

Byrd does not recall training employees on the sexual harassment policy or speaking to them about it. TR P34 L2-16. Byrd recalls speaking to Lydia Kachigian on a sexual harassment complaint made by Richards. TR P34 L22-25 and TR P35 L1-6. When asked to explain by specific instance how Richards was combative to him he stated that he asked Mary to put parts

away and she carried the boxed parts and sat them on the floor of the storage room rather than on the shelves. TR P36 L19-25 and P37 L1-4. Byrd could think of no other instances of combative behavior. TR P38 L20-25, TR P39 L1.

### Lydia Kachigian

Kachigian is a senior staff supervisor at U.S. Steel. TR P5 L21-23. Kachigian works in human resources. TR P6 L1-3. Kachigian met Richards in an early 2011 meeting in relation to a complaint Richards had of being discriminated against in the BOF Department. TR P6 L9-14. Attending was Richards, Kachigian, Nick Karsucki, and Jeff Evans. TR P6 L16-20. Richards was upset and crying in the meeting. TR P6 L21-25. Richards raised concerns over issues such as McBride and a radio, a jacket, and Richards delay in progressing from learner to an electrician. TR P7 L8-14. Kachigian admitted that Richards complained that Byrd told a story of his wife in the garden in reference to Miracle Gro and Byrd's wife saying he should put some Miracle Gro on his weezer. TR P9 L9-13. Kachigian asserts that the joke was inappropriate to tell in the workplace. TR P9 L16-20. The sexual harassment policy says sexual jokes are a form of sexual harassment. TR P10 L1-3. Kachigian knew Richards called the sexual harassment hotline after the meeting. TR P10 L5-11. Kachigian thought somebody, perhaps Mark Tade, did an investigation following the call but cannot recall the outcome. TR P10 L15-24. The Hotline is a confidential telephone line the employee can call for a violation of the law or ethical standards. TR P11 L1-8. Kachigian was familiar with a letter from OSHA (Exhibit 1) which relates to the BOF Department Electric Shop. TR P12 L2-9. OSHA did an investigation of that Shop between December 11, 2012 and March 21, 2013. TR P12 L15-21. The company believed there was no violations and took no steps in responding to the letter. TR P13 L1-13. Kachigian acknowledges that Richards told U.S. Steel about an incident where Richards was walking at the

BOF break/patio when Byrd approached her and pulled her jacket open. TR P14 L17-25, TR P15 L1. Kachigian stated: "I believe that, at least my recollection as I sit here today is, that there was some determination that may have occurred but that he was referencing something that was either sewn into the jacket, a pocket is my belief, and that's what he had opened up the jacket, seen that, and thought that was a nice addition to the jacket, and that's what he was referring to." TR P15 L8-15.

Kachigian was in charge of the investigation of the EEOC charges. TR P19 L19-23. Kachigian learned of the EEOC charges shortly after they were filed. TR P20 L1 -5. Kachigian spoke to the people who would have known of the issues including Jesse Byrd, Lowery McBride, Dan Harris, Nick Dentelman, and Ed Dintelman. TR P21 L9-18.

### Mitchell Lemmon

Lemmon is a shift supervisor for the U.S. Steel electrical department. TR P6 L1-2. Lemmon was a supervisor. TR P6 L15-17. Lemmon supervised Richards about 6 months in late 2010. TR P6 L20-25 and TR P7 L1-2. Lemmon did one evaluation of Richard's performance as a learner. TR P7 L3-10. Richards blamed Jesse Byrd for causing her a poor evaluation. TR P10 L10-16. Richards felt Byrd had influenced Lemmon to give her a bad evaluation. TR P10 L17-24. Lemmon states there is an annual class on sexual harassment for supervisors. TR P12 L13-15. Lemmon is unsure if he ever did training for workers under his supervision. TR P12 L16-18.

### Edward Dintelman

Dintelman has worked in the U.S. Steel electrical shop for 35 years. TR P6 L4-10 Richards works for the same shop. TR P7 L1-2. Dintelman is the area manager for the shop. TR P7 L7-10. Dintelman has had no disciplinary problems with Richards other than one

instance where she did not call off work. TR P8 L20-23. Dintelman, as a manager, attends a
class once a year on the sexual harassment policy but does no instruction on it. TR P13 L18-25.

### Daniel Harris

Harris is a shift supervisor at U.S. Steel Granite City Works. TR P6 L3-5. Richards was
a learner who came through his area several years ago. TR P6 L13-17. This would have been
around 2009 or 2010. TR P6 L18-25. Richards did a four month rotation for his unit. No. 2
Caster. TR P9 L4-9. Richards work ethics and willingness to work were very good. TR P9
L10-13. Richards, like the other learners, had deficiencies which were identified in the training
and addressed. TR P9 L18-23. Richards was the sole female in the learner group. TR P7 L18-
20. Richards told Harris she wanted to be the best electrician she could be and Harris told
Richards that she would never be able to meet his standards. TR P11 L3-19.

### Lowery McBride

McBride is Area Manager responsible for maintenance of the BOF. TR P6 L2-6
McBride knows Richards from the electrician learning program. TR P6 L11-20. McBride is
Byrd's supervisor. TR P7 L6-9. McBride admits an instance where he grabbed a radio off
Richard's chest to make a call. TR P10 L1-6. McBride was aware of an EEOC investigation.
TR P12 L17-25. There were allegations of harassment in BOF. TR P13 L11-16. McBride is
unaware of any training initiated in response to the OSHA letter. TR P16 L16-19.

### Jeremy Jewell

Jewell is a doctorate level psychologist who conducted an evaluation of Richard's
condition. Richards suffers symptoms of Dysthymic Disorder and PTSD and appeared as a
result of the complained of harassment at U.S. Steel.

## ARGUMENT

IHRA does not preempt all state law causes of action but only those where the duty allegedly violated in the state law cause of action was created by the IHRA and not by some other independent source. *Maksimovic v. Tsogalis*, 177 Ill 2d 511, 687 N.E. 2d 21, 23 (1997). Preemption depends on whether the duty alleged to have been breached exists independently of legal duties created by the Act. *Maksimovic* 687 N.E. 2d at 24.

Where it is clear that Plaintiff's claim rested not just on behavior that was sexually harassing, but rather behavior that would be a tort no matter what the motives of the defendant the claim is not preempted by the IHRA. *Naeem v. McKesson Drug Company*, 444 F. 3d 583 at 605 (7th Cir. 2006).

The precise issue of whether a trial court has jurisdiction to consider an intentional infliction of emotional distress claim based upon employment related conduct which may be characterized as sexual harassment was considered by the Federal District Court for the Northern District of Illinois in *Bailey v. Unical Corp.* (N.D. Ill. 1988), 700 F. Supp. 396. Where the elements of the tort require proof of nothing more than what is prescribed by the Act, and where the tort merely furthers the same policies of the statute the IHRA will preempt the tort action but where the tort requires more and thereby furthers goals in addition to those addressed by the IHRA, the Act will not preempt the claim. *Bailey*, 700 F. Supp. at 404.

The First District Appellate Court in *Pavilon v. Kaferly*, 561 N.E. 2d 1245, 204 Ill. App. 3d 235, 149 Ill. Dec. 549 followed the decision in *Bailey*. Claims with civil rights violations based on sex discrimination must be brought pursuant to the Illinois Human Rights Act. The intentional infliction of emotional distress is a common law tort theory, not a civil rights violation as defined by the Illinois Human Rights Act and does not depend on the policies or

provisions of the act for its viability. *Pavilon* at 1250. An independent common law claim for the intentional infliction of emotional distress is not barred by the Act. *Pavilon* at 1250.

The Illinois Supreme Court chose to recognize the tort of intentional infliction of emotional distress. Public Finance Corp. v. Davis, 360 N.E. 2d 765 at 767, 66 Ill. 2d 85, 4 Ill. Dec. 656 (Ill. 1976). The trend in the United States is to give an increasing amount of protection to the interest of freedom from emotional distress. *Public Finance v. Davis*, 66 IL 2d 85 (Ill. 1976).

To state a cause of action for intentional infliction of emotional distress, a plaintiff must allege facts which, if true, would establish that conduct by the Defendant was extreme and outrageous, that the emotional distress suffered by the plaintiff was severe, and that the Defendant either acted intentionally to cause distress or with knowledge of the fact that severe emotional distress would be certain or substantially certain to result. Pavilon at 1250.

The degree of power or authority which a defendant has over a plaintiff is a factor in whether the defendant's conduct is outrageous, *McGrath v. Fahey*, (1976) 126 Ill. 2d 78, 127 Ill. Dec. 724, 533 NE 2d 806. The more control the defendant has over the plaintiff the more likely that defendant's conduct will be deemed outrageous. *McGrath*, 126 Ill. 2d 87. The extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position which gives them actual or apparent power to damage the plaintiff's interests. *McGrath* 533 N.E. 2d at 810.

The Illinois Supreme Court in *Davis* recognized that the extreme and outrageous character of the conduct may arise from an abuse of a position or a relation with another which gives the actor an actual or apparent authority over the other with the power to affect its interests. The Illinois Supreme court has seized upon the abuse of position factor as a basis for applying

the tort of intentional infliction of emotional distress in the employment context reasoning that the imbalance in bargaining power between the employer and employee requires application of the tort. *Graham v. Commonwealth Edison*, 742 NE 2d 858 (Ill. App. Ct. 2000), *McGrath v. Fahey*, 125 Ill. 2d 78, 127 Ill. Dec. 724, 533, N.E. 2d 806 (1988).

As one court has emphasized, "conduct which might not ordinarily be actionable may be considered outrageous if the defendant knows that a plaintiff was particularly susceptible to emotional distress, *Pavilon v. Kaferly,* 561 N.E. 2d 1245 (Ill App. Ct. 1990). Behavior which "though rude abrasive or extremely inconsiderate" may not otherwise be actionable may be deemed outrageous if the defendant knows the plaintiff is peculiarly susceptible to emotional distress, *Davis,* 66 Ill. 2d 85. A pattern, course, and accumulation of acts can make an individual's conduct "sufficiently extreme to be actionable, whereas one instance of such behavior might not be." *Pavilk v. Kornhaber*, 326 Ill. App. 3d 731, 746, 260 Ill. Dec. 331, 761 N.E. 2d 175 (2001).

The Defendant here knew: They had total control over the Plaintiff's working conditions and employment status. There was then an imbalance of power and knowledge by the Defendant that the Plaintiff was subject to heightened emotional distress due to her stress over potentially losing a career in steelmaking. As stated in *Honaker v. Smith*, 256 F. 3d. 477 (7th Cir. 2001), "A additional consideration in determining whether extreme and outrageous behavior exists is whether the Plaintiff is particularly susceptible to emotional distress because of some physical or mental condition or peculiarity; behavior that otherwise might be considered merely rude, abrasive or inconsiderate may be deemed outrageous if the Defendant knows the Plaintiff is particularly susceptible to emotional turmoil. See *McGrath*, 533 N.E. 2d. at 811-12. This was part of a pattern of conduct by Byrd including forcing Plaintiff to endure his "rough" style while

demeaning and intimidating her. He knew she was the only female and reveled in angrily demanding she call him a "prick" and asking if she was afraid of him.

An additional factor considered by the courts is whether the Defendant reasonably believed that its objective was legitimate. *Honaker,* 256 F. 3d at 491. This Defendant could not have believed this behavior was acceptable.

There is no doubt that Richards suffered profound emotional distress and no doubt that the multiple actions of this Defendant led to that to that distress. Dr. Jeremy Jewell Report. Dr. Jewell examined Plaintiff and found that she suffers symptoms of Post-Traumatic Stress Disorder and these disorders appeared as a result of her traumatic experiences during her employ with Defendant.

As the Seventh Circuit has stated:

> To determine whether the conduct alleged is extreme and outrageous, we employ an objective standard, taking into consideration the particular facts of the case. *Id.* The Supreme Court of Illinois has described a number of nonexclusive factors that may inform this analysis, including: the degree of power or authority which a defendant has over a plaintiff; whether the defendant reasonably believed that his objective was legitimate; and whether the plaintiff is particularly susceptible to emotional distress because of some physical or mental condition or peculiarity. *Honaker*, 256 F. 3d 477 at 490-92. In the employer/employee context, courts have found extreme and outrageous behavior to exist where the employer "clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Id.* at 491. *In Lewis v. School District 70*, 523 F. 3d 730 (7th Cir. 2008).

Mary Richards had worked for U.S. Steel for 16 years. Difficulties began when she moved to an all-male environment in the BOF. Richards was the only female electrician in the learners program. Richards TR P91 L7-9. From day one she was regarded differently. Her manager, Jesse Byrd, called her in to ask her if she knew how to read blueprints. She assured him that she did but questioned why she was the only learner to be asked. Richards TR P38 L1-10. She found that there was no women's restroom in the department. She was forced to use the

men's restroom. She complained and a women's restroom was created. That lasted about a week when it was turned into a unisex restroom. Richards TR P133 L1-25, TR P134 L1-4, 9-14.

Richards was standing on a bucket to reach an area to get screws to fix a fluorescent light and Byrd asked her if the bucket "hold all of that". Richards TR P43 L9-21. In another instance Richards was in the break room when Byrd came in and made an off color joke. Byrd made remarks about his wife suggesting he put Miracle Gro on his weezer. Richards TR P92 L12-25.

Richards worked through an event where a fellow electrician suffered heat exhaustion. Richards got the worker to the break room and started aid. Richards TR P87 L1-25. Richards called for Byrd and when he did arrive he started screaming at her. Richards TR P88 L6-20. Richards was ordered to sit in the break room and Byrd approached her telling her to tell her boss he was a prick. Richards TR P89 L5-12. Richards said nothing. Richards TR P89 L11-12. Byrd then moved behind her and stated, "Matter of fact, tell your boss he's a prick." Byrd was her boss. Richards TR P89 L13-17. Byrd was angry and was pacing back and forth. Richards TR P89 L13-20.

Richards asked Byrd for tools on two instances and Byrd would not provide them. Richards TR P26 L113-17. Byrd used Richards to call a male worker and ask that he come in for overtime. Richards was available and asked if she could work the shift. Byrd stated that he would rather jump off a bridge than see her doing overtime. Richards TR P69 L10-21. Richards asked Byrd on an occasion when he was with a group of male coworkers if she could have a glove. Byrd asked her if she needed one or two gloves and made a snide comment about incompetent people. Richards TR P46 L1-8.

Byrd approached Richards in a break area when they were done and grabbed her jacket jerking it open. Byrd, while looking at her chest, stated, "I like that." Richards TR P38 L21-25 and TR P39 L1-9.

The testimony of Defendant's H.R. officer was that Byrd was just checking a nice pocket she had sewn on the inside of the jacket. Kachigian TR P15 L8-15. This begs the question as to how Byrd knew any pocket had been sewn on the inside of Richard's jacket and why Byrd would think that he could grab a female subordinates jacket ripping it open and make such a comment. Richards complained to Kachigian of the joke about putting Miracle Gro on her supervisor's weezer and about the harassment Richards was suffering at Byrd's hands. Kachigian TR P9 L9-13. The response of Human Resources was that she was simply being too sensitive and had to "adjust" to Byrd's "rough" management style. Richards TR P53 L17-22. Richards was so upset by the conversation that when she located in a weekly update a number for U.S. Steel's newly initiated harassment hotline. Richards TR P53 L17-22. Richards was told to go see the Human Resource Officer, Mark Tade. Tade spoke to her about the jacket and the other issues. Tade told her that she was "too emotional" and needed to see a psychiatrist. Richards TR P121 L17-23.

All of these actions were part of a course of conduct and pattern. The company had all of the power in the relationship. Richards went to her union repeatedly seeking their counsel. Her union rep., who had not worked on such cases prior, prepared civil rights complaints which he then provided management. Richards TR P19 L5-7. Richards complained to Byrd himself. Richards TR P21 L12-14. All of this was to no avail.

When Richards was able to transfer from BOF, she did so. Even after that time Richards found Byrd approaching her after work as if they were to clock out together and attempting to

initiate conversations while standing right beside her. Richards was extremely upset with this and refused to speak with him. Richards TR P157 L1-25, TR P159 L19-22.

Richards was then disciplined for calling in late for a shift with the company eventually attempting discharge. Under the contract entered into by management and labor, this resulted in an arbitration hearing which was delayed until the summer of 2014. Plaintiff prevailed and the discharge was overturned. Richards TR P249 L1-12. This does not change the fact that Richards feared the loss of her livelihood throughout this period. The company knew this uncertainty and fear would weigh on her.

The Defendant should have known that its conduct could reasonably be expected to cause extreme emotional distress. This is not everyday job stress created by the "average" work environment. *Honaker v. Smith*, 256 F. 3d 477, 491 (7th Cir. 2011). This was simply mayhem. It is empowering bad and offensive conduct. Ripping a jacket open to look and comment on a female worker's chest who you supervise is extreme and outrageous and not average. Is it "average" to then have H.R. tell you to get used to it and state he is just rough? Is is not average to go to H.R.'s worker's supervisor to ask for help and be told to "see a psychiatrist" because you are too emotional? It is not average to listen to the supervisor telling off color jokes about his "weezer" in front of an all-male group of workers and Plaintiff? How about the boss angrily approaching Plaintiff ordering her to call him a "prick" while he angrily paced around her? What about approaching Plaintiff stating "Are you afraid of me?" This is the essence of harassing behavior designed to cause Plaintiff profound upset.

Just how ridiculous this defendant's behavior was is reflected in the testimony of the Human Resources officer who when asked about Byrd jerking Plaintiff's jacket open admitted there was a determination it had occurred but claiming the supervisor was only referring to a

pocket inside the jacket which the supervisor admired and thought "was a nice addition to the jacket." Kachigian depo TR P15 L8-15. Defendant argues this is only a normal vagary of the workplace. This was then followed by Plaintiff's appeal for help from Mark Tade who told her she was too emotional and needed to see a psychiatrist.

The result of all of this is that Plaintiff now suffers Post Trauma Stress Disorder and depression.

Plaintiff has shown, particularly if all inferences are to be drawn in her favor, that the Defendant's conduct was extreme and outrageous. This is particularly so where a clear pattern has been shown. There are just too many events which cumulatively weighed so heavily on this unfortunate female employee. The Plaintiff has shown that she did suffer distress by the fact of her seeking counseling and diagnosis of P.T.S.D. This Defendant should reasonably have known these behaviors would be substantially certain to cause profound emotional distress.

WHEREFORE, the Defendant's Motion for Summary Judgment should and must be denied.

Respectfully submitted,

/s/Greg Roosevelt
Greg Roosevelt, #02375427
Roosevelt Law Office
610 St. Louis Street
Edwardsville, IL 62025
618-656-9160
618-692-9718 Fax
gregroosevelt@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the **Plaintiff's Response to Defendant's Motion for Summary Judgment** was sent electronically via the CM/ECF system to the following on the 23rd day of March, 2016.

      Stephen L. Beimdiek
      Carolyn M. Kopsky
      LASHLY & BAER, P.C.
      714 Locust Street
      St. Louis, MO 63101
      314-621-2939
      314-621-6844 Fax
      sbeimdiek@lashlybaer.com
      cmkopsky@lashlybaer.com

                         /s/Greg Roosevelt
                         Greg Roosevelt, #02375427
                         Roosevelt Law Office
                         610 St. Louis Street
                         Edwardsville, IL 62025
                         618-656-9160
                         618-692-9718 Fax
                         gregroosevelt@gmail.com